## WARING *v.* CRAM.

If a partnership, after its termination by death, dissolution, bankruptcy, or otherwise, is continued by any portion of the associates with the capital or appliances of the firm; all profits derived from such continued business are part of the joint estate; and as such, are to be accounted for to all the partners, or their representatives.

If one partner clandestinely carries on another trade, or the same trade for his private advantage, and in a manner injurious to the true interests of the partnership, he will be compelled in equity, to account for all profits made thereby.

If one of several partners employ the partnership capital or effects, in a matter not the direct object of the association, he must account with his co-partners for the profits resulting from such an employment of the common effects. If the common stock and fund or capital of a co-partnership consist of labour and skill, as well as money, and, during the existence of the enterprise, either diverts that from the common object to which it was pledged, and employs it for other productive purposes, either of the same or any other kind, he must bring the result into the common fund.

Where a number of individuals formed an association for a specified term, to engage in mining for gold in California, and one advanced money—and the others agreed to proceed to the mines, and engage in the digging for gold, but when they arrived, the capital advanced being exhausted, and all abandoned the enterprise as fruitless, and two of them engaged in another and different employment of their labour; it was held that the associate who advanced the money, had no specific lien on the profits produced by such labour, as could be enforced in a Court of Equity. His remedy, if any he had, was by an action for damages against those who abandoned the association.

The apparent weight of authority is, that an answer filed, after notice by the plaintiff, of an application for a special injunction, can only be used as an affidavit; and the defendant cannot insist that, under such circumstances, the plaintiff is confined in his injunction to the equity confessed in the answer.

A Court of Equity never awards a special injunction, except when the plaintiff shows a clear equity entitling him to the aid and relief asked for; nor is it ever awarded except in clear cases of right.

*Sept* 28. THIS was a bill in equity filed by Hiram Waring against Smith Cram and Charles S. Cram, setting forth that in January, 1849, the complainant entered into an agreement with the respondents, and six others, whose names were mentioned, by which they formed an association for the purpose of carrying on the business of mining, and collecting gold and other minerals in California, under the name and style of the "Putnam Mining Company."

That by the terms of the agreement, the complainant was to furnish, at his own expense, to each of his associates (he remaining in this country), a passage to Chagres, in the steamer Falcon, and also advance them the sum of $1500, to be by them expended in defraying the expenses of their journey from thence to San Francisco, in California, and thence to the region of the gold mines;

and that he would provide them also with a suitable outfit for proceeding to the region of the gold mines, and for undertaking their contemplated business on arriving at the gold region.

That it was further agreed he would resort only to his share of the clear net profits of said business, for the repayment to himself of the sum advanced by him for said purpose; and that he would deposit all the gold dust and ore sent to him by his associates in the Mint of the United States. That at the end of two years from the date of the agreement, he would pay for and provide a passage from California for each of said associates, or so many of them as might desire to come to New York; and to keep just accounts of all articles of merchandise sent to said associates at prime cost, and of all expenses, for which he was to be paid, as provided in said agreement.

It was also averred in the bill, that, in consideration of these stipulations on the part of the complainant, his said associates agreed to proceed at once to Chagres, and thence with all practicable speed to the region of the gold mines, in California; to apply the said $1500 towards the expenses of their journey to the mines, and upon their arrival would faithfully employ themselves in the business of mining and collecting gold and other minerals; and from time to time, as a safe opportunity might occur, to ship and send, consigned to the complainant, in the city of New York, such gold dust, ore, or other minerals, as should be collected by the parties of the second part to said agreement. And also that they would receive such articles of merchandise as should be sent them by the complainant, and allow him therefor in the final settlement of the business and affairs of the association, and his expenses in the premises. And further, that the association should continue two years from the date of the agreement, and should not be dissolved by the death of any or either of the parties, but should be carried on in such manner and place in California as should be prescribed by a majority of the parties to the agreement. That if any one of them should become sick, he should be provided for at the cost of the association; and that, at the expiration of the term of two years, there should be a full settlement of the affairs of the association, and the avails and proceeds of the business should be divided, by first paying the complainant for all the articles and merchandise sent to his associates, the expenses thereof, insurance, &c., and the price of the home passage of his associates; second, all the reasonable expenses of said associates in carrying on their business; and out of the clear gains and net profits the

2 X

complainant should be entitled to receive one equal half part, and the other half part was to be equally divided among the other associates. It was also further stipulated in the agreement, if, during the continuance of the association, either of said parties should absent from or leave the association, or refuse or neglect to employ himself in the business, in the manner and place provided by a majority of the parties, such party or parties should forfeit his or their share or shares in the proceeds and avails of the business, and all his right thereto should be at an end, and absolutely cease and determine, and his share therein should be distributed, one-half to the complainant, and the other half among the other associates. The agreement was in writing, and a copy annexed to the bill.

It was then averred that the complainant made the advances, furnished the outfit, and in all things fully complied with the stipulations in the agreement. That the other parties to the agreement set out for California, according to the stipulations therein, and that all with the exception of the respondents remained there, so far as the complainant knew. But that the said Smith Cram and his son Charles had returned to the United States, and were in Philadelphia or New York, and that the said Smith Cram had brought with him a large amount of gold dust, valued at $11,734, which was deposited in the Mint at Philadelphia, in his name, for which he had received the certificate of the proper officer.

It was further averred, that Smith Cram went to California as one of the associates, and received his advance and outfit from the complainant, and was bound to pay over to him all the gold dust or minerals which might be acquired by him during the two years, to be disposed of by the complainant according to the terms of the articles.

That during his residence in California, said Cram collected and received a large quantity of gold dust, &c., which, according to the articles of agreement, should have been paid over, sent, or shipped to the complainant, and that said Cram should have remained to prosecute his labours, which appeared to have been successful, for the whole period of two years, for the benefit of his associates and himself; but, having received a large quantity of gold dust, he had abandoned his associates and returned to this country; and, instead of shipping the gold dust to the complainant, he was retaining it, and had given him no information or account of said gold, but had privately deposited it to his own use in the Mint, to be coined and turned into current money.

After propounding the interrogatories, there was a prayer for a decree that the sum so deposited be paid to the complainant for the use of the association, and that Smith Cram be restrained by injunction from receiving the money from the Mint, or otherwise interfering therewith; with a prayer for general relief.

Notice was given for a special injunction, and before the argument of the motion the respondent filed an answer, in which it was admitted that the contract was as stated in the bill, under the name and title of the "Putnam Mining Association," and that the complainant did furnish the outfit to the respondent before leaving New York, and did pay his passage to Chagres in the steamer Falcon, as stipulated in the articles. But it was denied, that any part of the $1500 was paid to the deponent; what he knew of this was that he saw at Panama $1025, in the possession of the brother of the complainant; that this sum was entirely inadequate to take him and associates to the mines, and that in consequence thereof, they were delayed three months at Panama, and finally were unable to leave, only by procuring contributions from other sources. It was further stated that all the parties except the respondent and Charles S. Cram, were not in California acting under said articles of association. That the said respondent went to California, but did not receive the advancement stated in the bill from the complainant, and therefore was not bound to pay over the gold and minerals acquired by the respondent during the two years. The answer averred that during the residence of the respondent in California, he did not collect or receive a large quantity of gold dust or other minerals in the way of mining under the agreement, which, according to the terms thereof, should be paid over, sent, or shipped to the complainant; nor was he bound to remain to prosecute his labours under the same, for the space of two years, for the benefit of himself and associates; nor, after collecting a large quantity of gold dust, did he abandon his associates; but on the contrary, the said association, for the want of proper advances by the complainant, and misfortunes, turned out disastrously, and the members thereof scattered in different directions in a few weeks after arriving at the region of the mines, and each one was obliged, for self-protection, to labour to obtain the necessaries of life, and betake himself to his own individual means and industry. That the respondent did not collect gold dust enough at the mines or other minerals to pay his necessary expenses, and left the same from the necessities of his situation, and with his son Charles betook himself to industrious mechanical work, as a pile-driver, in the town

of St. Francisco, where, and by which means, he made by days' labour, driving piles at so much a pile, all the money which he deposited in the Mint, and for which he received on deposit the receipt or certificate mentioned in the bill. The respondent denied that he had deposited in the Mint, at Philadelphia, any gold dust, or other minerals, in his own name, which in any manner or form was the property of the association, or in fraud of his agreement and stipulations. It was distinctly stated that the association had broken up and was largely indebted to the respondent. And the whole equity of the bill was denied.

A motion was made for a special injunction, which, on notice, was argued before Judges KING and PARSONS.

It was argued by Messrs. *J. Williams Biddle* and *H. J. Williams* for the plaintiff; and *J. Murray Rush* and *P. M'Call* for the respondents.

It was contended for the plaintiff that this was a partnership, and was to be governed by the same rules which apply when one takes profits out of the partnership funds and trades upon them. These must be accounted for, with all the profits made thereon ; and cited Catherwood *v.* Collins, 2 Russ. 325 ; 15 Vesey, 218 ; Brown *v.* De Tartet, Jacobs, 284 ; 2 Keene, 722 ; 17 Vesey, 298 ; 1 John Ch. Reps. 305 ; Ib. 407.

It was contended that the advance of the expense to go to California was capital. The subsequent profits made by the defendant's labour was the result of that capital. This was capital advanced for the outfit ; and he was as much bound to account for the profits of his labour, as if he had employed a part of the capital of the partnership business in any other concern : 1 Taunt. 112 ; Forte *v.* Stewart, 3 M. & S. 121 ; 6 Term Reps. 222 ; Blake *v.* Leonard, 3 Camp. 43 ; 6 Pick. 420 ; B. Monroe's Reps. 150 ; 1 Swanst. 508 ; 15 Vesey, 50.

The partnership could not be dissolved without notice, and in this case no notice was given. These men could not dissolve the firm, and set up business for themselves, and leave the plaintiff who had advanced all the capital: 11 S. & R. 41 ; 1 Iredell's N. C. Rep. 199 ; 8 Vesey, 46.

Mr. *M'Call* and Mr. *Rush.*—The arguments of the plaintiff's counsel do not convince us that this was partnership property. Is all the labour of the defendants in California, as well as in this country, for two years, partnership property ? If the argument

advanced by them is sound, that all the labour of our clients is partnership property, then what they earn from day to day now, is partnership property. He who makes such an extravagant claim must prove it. This cannot be pretended in a matter of contract like this, for the contract had but one object, that of mining gold, and there is nothing said of any other labour. If the plaintiff has any remedy, it is by an action at law against the retiring partner, for not pursuing the business, or the remedy provided for in the contract.

Any one partner can separate himself from the concern at his pleasure: 1 Wharton, 388.

The agreement does not put labour on the footing with capital stock. There is nothing which shows that labour, no matter how performed, was put in the business; it is nowhere so said. If one put into capital stock a given sum, for the prosecution of a particular business, that does not bind all his fortune to the stock, so that he can engage in no other business; nor when one agrees to give labour for the joint stock for the prosecution of a particular enterprise, from being employed in any other business. All the cases cited, are those where actual capital has been put into the business, and it has been diverted and used in another employment, and if profitably used, was held to have been for the joint advantage of all concerned in the advancement of the capital. But future labour is a prospective thing, and bears no analogy to capital. Here there has been no attempt to show that the partnership funds, or any part thereof, were used by the defendants.

It was contended that the bill and answer show that the plaintiff was guilty of a breach of contract. That the partnership was dissolved before the property in question came into existence: 1 Whart. 388; 17 John. 525; 19 John. 538; Gow on Part. 241, 248; 3 Kent Comm. 54. Notice of dissolution is merely notice to third persons: Bassit on Part. p. 37, note.

Mr. *Williams*, in reply.—The answer is before the return-day, and it is to be treated but as an affidavit: Drury, 37. When treated as an affidavit, it must particularly deny the statements of the bill. Here is no denial: 19 Vesey, 350. All are affidavits until after the return of the subpœna; and if the Court see any good ground, they will retain the money from the respondent.

The labour of the defendants in California was their proportion of the capital of the joint concern, and however employed this labour might have been, it was the joint stock, and its results joint

property. Each and every individual is engaged to labour for the plaintiff at mining gold, and whether a dissolution took place or not. Each one of the company was bound to labour for him.

The association as to themselves was made truly for each, but still Mr. Waring had an interest in their individual labour which remained unaffected by their dissolution.

It has been said the penalty or forfeiture is the sole remedy for the plaintiff. But the agreement shows that Mr. Waring furnished them with all the means they had for labouring, and this stipulation is most material in showing that the object was in obtaining their labour as their portion of the capital. Fanning v. Chadwick, 3 Pickering, 420, is a case similar in principle to this. The principle of a dissolution of ordinary partnerships does not apply to a case like the present. This is a contract really for labour rather than a common partnership. Notice therefore of the dissolution, according to all principles of justice and morality, was demanded, if it was intended a dissolution should take place.

The following opinion was delivered by

KING, President.—It is a doctrine of the law of partnership, that if, after the termination of any partnership, by death, dissolution, bankruptcy, or otherwise, the business is continued by a portion of the associates, with the capital or appliances of the firm, all profits derived from such continued business are part of the joint estate, and as such are to be accounted for to all the partners or their representatives, reasonable allowances being made to those of the associates by whom the active business has been conducted. These principles are the result of the cases of Crawshay v. Collins, 15 Vesey, 218; Same Case, 2 Russell, 325; Brown v. De Tartet, 1 Jacobs, 284; Wedderburne v. Wedderburne, 2 Keene, 722; and Long v. Magestre, 1 John. Ch. Rep. 305; Holden v. M'Mackin, ante, p. 270. It is a principle equally clear, that if one partner should clandestinely carry on another trade, or the same trade, for his private advantage, and in a manner injurious to the true interests of the partnership, or should divert the capital or funds of the partnership to such secret or sinister purposes, he will be compelled in equity to account for all profits made thereby: Story on Part. 273. In Burton v. Wookey, 3 Madd. 367, a partner making purchases on his private account of merchandise in the trade in which his firm was engaged, was held liable to account to his partners for the profits of such purchases. "It is," says Sir John Leach in that case, " a maxim of the Courts

of Equity, that a person who stands in a relation of trust or confidence to another shall not be permitted, in pursuit of his private advantage, to place himself in a situation which gives him a bias against the due discharge of that trust and confidence." Nor will equity permit that parties bound to each other by express or implied contract to promote an undertaking for the common benefit, should any of them engage in another concern, which necessarily gives them a direct interest adverse to the original objects of their association: Glossington *v.* Thwartes, 1 Sim. & Stewart, 124, 133. And if one of several partners employ the partnership capital or effects, in a matter not the direct object of the association, he must account with his co-partners for the profits resulting from such an employment of the common effects. This was the case in Fanning *v.* Chadwick, 3 Pick. 420, where the defendant, who was a joint owner and commander of a whaling-ship, having received compensation in the course of his voyage for landing some prisoners, and also for saving property from a wreck, was held liable to account with his co-partner for the money so received.

In all this class of cases it will be perceived, that the profits of which an account was decreed, were derived either from the employment of the capital or appliances of the firm in the same business; in an analogous one; or in some new or incidental undertaking. It was because the profits claimed flowed from the use and employment of that which belonged to all, that the equity of all to partipate in such profits arose. This principle is one too clear to be questioned. But to bring this case within these admitted principles, it was argued that the labour of the associates forming the " Putnam Mining Company," was part of the capital of the association, and that all results of that labour, whether employed in mining or in any other pursuit in California, was the employment of that which belonged to the association, and entitled all the associates to participate in its results.

That the common stock, fund, or capital of a copartnership may consist of labour and skill as well as money, goods, or other property, is certainly true. One associate may contribute money, another property, and a third labour and skill. And if, during the existence of the enterprise, either party diverts that from the common object to which it was pledged, and employs it for other productive objects, either of the same or any other kind, he must bring the results into the common fund; because the consideration given by each for a joint participation in the common profits of the society, was the amount of money, the quantity of property, or

the extent of labour and skill agreed to be furnished and employed for the common good by each respectively. If either associate could abstract his contribution, whether money, property, or labour, from the common capital, and employ it for his own profit, it is plain that he will receive his proportion of the profits of the joint concern without any corresponding consideration. So far this doctrine of implied obligation, arising from the *subsisting* relation of partner and co-partnership, is consistent with right reason, common justice, and mutuality of obligation between contracting parties. It simply operates to maintain good faith between the associates, and to oblige all who claim the benefit of the joint enterprise to contribute to its success that which each bound himself to do on entering into the association.

But the case before us is not that of one who, while a continuing member of an existing partnership,.to the business of which he has bound himself to devote all his labour and skill, withdraws a portion of that labour or skill from the common enterprise, and devotes it to his individual profit or advantage.

The defendants' answer shows that, after an unsuccessful attempt by the associates in California to procure gold at the mines, *all* abandoned the enterprise as hopeless, and each sought to procure his own subsistence as best he could. The small fund advanced in New York by the plaintiff, who was the money partner, was ' exhausted before the arrival of the associates at the mines, and all exertions terminated with the failure of the first attempt. And seeing their destitute condition, it is difficult to .perceive how it could have been renewed with any rational prospect of a successful issue. Under these circumstances, the defendant returned to San Francisco, and there successfully employed his industry as a pile-driver, from which source alone he has derived all the money which, by this procedure, the plaintiff seeks to possess himself, of as part of the result of the labour of the "Putnam Mining Company."

It is difficult to perceive how this result could legally arise, even supposing the plaintiff to have wrongfully withdrawn from the company, and to have devoted his industry to other pursuits than those originally contemplated by the articles of association; unless we should hold that one of the effects of entering into a co-partnership for a term of years, is so to bind a party to it, as to force him to prosecute, under the most unpromising circumstances, such an enterprise ; and that the estimate of the damages sustained by the partnership from his withdrawal from it, must at least be all that his industry employed, during the undetermined part of the

partnership, no matter how realized. Of his liability for such damages as a jury on a trial at law might award against him under the circumstances of such a withdrawal, no doubt can exist. These might be more or less than the subsequent earnings of his industry otherwise employed. But such a claim for damages could only be determined at law, and no specific lien exists on the avails of his intermediate labour that a Court of Equity could enforce by restraining him from the use of it before any alleged damage, arising from his withdrawal from the business of the partnership, had been ascertained by trial and verdict.

The present is not the case of an unauthorized and unnecessary abandonment of the joint enterprise. The answer and affidavit of the defendants, which are uncontradicted by any counter affidavit of the plaintiff, exhibit a case in which the association or partnership, admitting it not to have been formally dissolved, was dissolved in fact, by the associates in California, from their total destitution of funds or other means for the further prosecution of their enterprise, and from their mutual and necessary separation, arising from these causes. According to the apparent weight of the authorities, it is true that the answer filed after the plaintiff has served his notice of a motion for a special injunction, can only be used as an affidavit in opposition to those used by the plaintiff, and that the defendant cannot insist that under such circumstances the plaintiff is confined in his injunction to the equity confessed in the answer: Atkinson *v.* Collins, Hogan's Rep. 110 ; Moffat *v.* Jones, 19 Vesey, 350. But giving for the purposes of this case no greater efficacy to the uncontradicted answer, it fully establishes the foregoing as the causes which produced the dissolution, in fact, of the "Putnam Mining Company."

To hold that in such a state of things the avails of the labour and skill of each of the adventurers, wherever and however employed in California, are to be deemed the assets of the company, would be carrying the doctrine of the implied accountability of co-partners to the partnership, to a most extravagant length. The money on which the injunction is proposed to operate, is neither the proceeds of the capital of the company employed after its dissolution, nor is it the result of the surreptitious employment of the labour or capital of the company during its actual existence by one of the associates for his own profit, nor is it the result of such labour and capital incidentally employed in objects different from those of the company by part of the associates. In such cases, equity either has actually compelled, or expressed itself prepared to

compel, an account of such profit, for the common benefit of the partnership.

If it had been the intention of these parties that, in the event of any one of the associates withdrawing from the company, and otherwise employing himself, the avails of such employment should enure to the common benefit, it was an easy thing to have introduced such understanding into the articles. The case of separation of individuals from the association, before the term limited for the close of its existence, was in the contemplation of the associates. The case of such a withdrawal, or desertion, as it is called in the articles, was provided for. And the penalty on the deserter was fixed as the forfeiture of all his interest in the profits of the company, accumulated at the time of his desertion. The effort here is to introduce through the action of this Court a new and stringent term into the contract of association, not expressed in it. But even if such a term had been found in the articles, still such a liability could only have arisen from a wilful and unnecessary abandonment of the enterprise, and would not have been consequent on an abandonment induced by inevitable and uncontrollable circumstances.

If the continuing partners of the "Putnam Mining Company," or any of them, have sustained any special damage from the unjustifiable withdrawal of the defendants from the association, the remedy for the wrong is to be sought for at law. Equity can exercise no jurisdiction enabling it to possess itself of the results of the labour of such seceding partner, and to retain them to await the result of such an action, and to apply them to the payment of any damages a jury might award to the injured party. This would be, under most circumstances of alleged breach of contract complained of, an energetic measure, and one certainly that no Court has the right to employ in a case like the present.

On the case therefore disclosed, the plaintiff cannot obtain the relief he asks here, and consequently we cannot properly award a preliminary injunction, which is never awarded except where the plaintiff shows a clear equity, entitling him to the aid and relief of the Court. A preliminary injunction is emphatically the strong arm of the Court, and is never awarded except in clear cases of right, and where no doubt exists as to the claim of the plaintiff to the remedy he invokes.

Special injunction refused.